MAMIYE BROS., et al., Libelants,

v.

BARBER STEAMSHIP LINES, INC., et al., Respondents,

v.

ATLANTIC STEVEDORING CO., Inc., et al., Impleaded-Respondents.

GELMART KNITTING MILLS, INC., et al., Libelants,

v.

BARBER STEAMSHIP LINES, INC., et al., Respondents,

v.

ATLANTIC STEVEDORING CO., Inc., et al., Impleaded-Respondents.

ISAAC COHEN & SONS CORP., et al., Libelants,

v.

BARBER STEAMSHIP LINES, INC., et al., Respondents,

v.

ATLANTIC STEVEDORING CO., Inc., et al., Impleaded-Respondents.

United States District Court
S. D. New York.
May 5, 1965.

Bigham, Englar, Jones & Houston, New York City, Vincent L. Leibell, Jr., Charles W. Harvey, Christopher R. Knauth, New York City, of counsel, for libelants.

Haight, Gardner, Poor & Havens, New York City, Tallman Bissell, Thomas R. H. Howarth, Philip V. Moyles, New York City, of counsel, for respondents.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, Eli Ellis, Robert H. Peterson, Robert W. Mullen, New York City, of counsel, for impleaded-respondents.

WYATT, District Judge.

These are three admiralty suits in personam, consolidated for trial by a pre-trial order of Judge Sugarman filed April 3, 1963 (Rule 13 of Admiralty Rules of this Court). They are to recover for damage caused to cargo goods by high water which on September 12, 1960, flooded Pier 5 in Brooklyn where the goods were being held. The high water was associated with Hurricane Donna which passed New York Harbor on the date given. There is no dispute as to the fact of water damage nor as to the reason therefor.

After trial, the decision is that the libel in each of the three suits must be dismissed on the merits.

1. The three separate libels

 a. The Mamiye Bros. suit (61 Ad. 779)

This libel was filed on June 28, 1961. The libelants, thirty-eight in number, are the consignees or owners or both of cargo items which were discharged to Pier 5, Bush Terminal, in Brooklyn prior to September 12, 1960 from M/V Toreador or, as to one of the cargo items, from M/V Turandot. Respondents are Barber Steamship Lines, Inc. ("Barber") and various other corporations, partnerships and individuals engaged as owners and operators of common carrier cargo vessels; some of the respondents owned or operated or both the Toreador and the Turandot. The libel alleged that when delivery of the cargo items was made to libelants by respondents (this delivery would be after September 12, 1960), such cargo items were not in the same good condition as when delivered to respondents for carriage but were damaged in the aggregate amount of $147,460.44 because they were "slack, wet, stained and deteriorated".

In this suit, there are nine named respondents as follows:

Barber

Wilh. Wilhelmsen

Dampskibsaktieselskabet
Den Norske Afrika-Og Australielinie

Wilhelmsens Dampskibsaktieselskab

A/S Tonsberg

A/S Tankfart I

A/S Tankfart IV

A/S Tankfart V

A/S Tankfart VI

All have appeared in the suit.

The bills of lading for the Toreador shipments and the one Turandot shipment show, however, that the named respondents Barber and Wilh. Wilhelmsen had no ownership in either of the two vessels and were not parties to the bills of lading, the contracts of carriage. The libel would on this account be dismissed as against them in any event. The other respondents were owners of the carrying vessels, were parties to the contracts of carriage, and are proper parties respondent. Respondents brought into the suit—as impleaded respondents under Admiralty Rule 56 of the Supreme Court—the pier terminal operator (which happened to be also stevedore for respondents) and an affiliate of the pier operator, the lessee of Pier 5, respectively, Atlantic Stevedoring Co., Inc. and Atlantic Piers Co., Inc. These two last named corporations are subsidiaries of Barber. The petition to implead averred that respondents had a contract with Atlantic Stevedoring for stevedoring and terminal operation services; that in the contract Atlantic Stevedoring agreed to indemnify respondents for any liability imposed on respondents by reason of the negligence of Atlantic Stevedoring; that the damage to the cargo items from the Toreador and Turan-

dot occurred while such cargo items were in the custody of Atlantic Stevedoring on Pier 5; and that if there was any negligence, it was solely the negligence of Atlantic Stevedoring "in the maintenance of the pier and the care and custody of said shipments". The petition to implead further averred that Atlantic Piers was the lessee in possession of Pier 5 in Brooklyn; that when there was high water at Pier 5 on September 12, 1960, the cargo items were in the custody of Atlantic Piers as the lessee of Pier 5 and as bailee; and that if there was any negligence causing the damage by wetting to the cargo items it was solely the negligence of Atlantic Piers "in the maintenance of said pier and the care and custody of said shipments". Respondents ask, therefore, that if they (respondents) are held liable to libelants, there be recovery over in favor of respondents against the impleaded respondents.

b. The Gelmart Knitting Mills, Inc. suit (61 Ad. 807)

This libel was filed on July 5, 1961. The libelants, some twenty-one in number, are the shippers (consignors) or owners or both of cargo items which are alleged to have been delivered to respondents at Pier 5, Bush Terminal, in Brooklyn, for shipment to foreign ports by respondents on vessels, the M/V Turandot, the M/V Tatra and the S/S Queensville. Respondents are Barber and various other corporations, partnerships, and individuals engaged as owners and operators of common carrier cargo vessels; some of the respondents owned or operated or both the Turandot, Tatra, and Queensville. The libel alleged that after delivery to respondents and while the cargo items were on Pier 5 in their custody the cargo "became damaged by water" to the extent of $32,768.83.

In this suit, there are 16 named respondents as follows:

Barber

American–West African Line, Inc.

D/S A/S Den Norse Africa-Og Australielinie (there are many variants in the spelling of this word in the papers; this spelling is used uniformly because it is employed in the printed bill of lading.)

Wilh. Wilhelmsen

Wilhelmsens D/S A/S

A/S Tonsberg

A/S Tankfart I

A/S Tankfart IV

A/S Tankfart V

A/S Tankfart VI

Barber Mediterranean Line, Inc.

Barber Line

A. F. Klaveness & Co. A/S

A/S Solstad

D/S A/S International

James Denny

No citation was ever served on respondent James Denny nor did he ever appear. All the other respondents have appeared. The bills of lading and dock receipts show that the several shipments (except for items 19, 20 and 23 of Schedule A to the libel) were delivered to Pier 5 for shipment out by Turandot and Tatra. There is no evidence in the record of delivery of anything for shipment out by Queensville. There are dock receipts (signed by the receiving clerk of the pier operator) covering items 19, 20 and 23 of Schedule A to the Gelmart libel; these dock receipts are marked "Hold on Dock" but without the name of any ship; as to items 19 and 20 the receipts indicate in typewriting that the shipment was to go by "Barber Line" or "Barber Steamship Line" and as to item 23 the dock receipt is unsigned but is on a printed form of "Barber Line". Respondents appear to make nothing of these differences and for present purposes they are ignored.

The following respondents were owners of the Turandot and Tatra and as such parties to the contract of carriage and to receipt of the cargo items by their agents at Pier 5:

Dampskibsaktieselskabet Den Norske Africa-Og Australielinie
Wilhelmsens Dampskibsaktieselskab
A/S Tonsberg
A/S Tankfart I
A/S Tankfart IV
A/S Tankfart V
A/S Tankfart VI

These are proper parties respondent. As to the other named respondents in this suit, the libel would be dismissed as to them in any event unless before entry of the decree it could be shown that other respondents are proper because of the facts concerning items 19, 20 and 23 of Schedule A annexed to the libel. On substantially the same averments as in the first suit, respondents by petition brought into the second suit—as impleaded respondents under Admiralty Rule 56 of the Supreme Court—Atlantic Stevedoring and Atlantic Piers; recovery over was asked on the same basis.

### c. The Isaac B. Cohen Sons Corp. suit (61 Ad. 1096)

The libel in this suit was filed on September 12, 1961. Ten of the libelants are the consignees or owners or both of cargo items which were discharged to Pier 5 in Brooklyn prior to September 12, 1960 from the Toreador, the Turandot and the Talleyrand. Twelve of the libelants are the shippers (consignors) or owners or both of cargo items which are alleged to have been delivered to respondents at Pier 5 in Brooklyn for shipment to foreign ports by respondents on the motor vessels Tatra, Turandot and Corneville. Respondents are Barber and various other corporations, partnerships and individuals engaged as owners and operators of common carrier cargo vessels; some of the respondents owned or operated or both the Toreador, the Turandot, the Talleyrand and the Tatra.

The Corneville, according to a bill of lading in evidence (Ex. 11; item 17 of Schedule B to the libel) and according to advice from counsel for respondents, was owned by S/A Sangstad—not a party to any of the suits. There could thus have been no decree in any event as to the deliveries for shipment by Corneville (items 17 and 18 of Schedule B to the libel).

As to the cargo discharged to Pier 5 from Toreador, Turandot and Talleyrand, the libel alleged that when later delivered to the ten libelants concerned, it was not in the same good condition as when delivered to respondents but was damaged in the aggregate amount of $17,171.51 because it was "slack, wet, stained and deteriorated". As to the cargo items delivered by the twelve libelants to respondents for shipment to foreign ports, the libel alleged that after delivery to respondents and while the cargo items were in their custody, the cargo "became damaged by water" to the extent of $22,283.58.

In this suit, there are the same 16 named respondents as in the Gelmart suit (61 Ad. 807). As already noted, respondent James Denny was never served with citation and never appeared. All the other respondents have appeared. The bills of lading show that the vessels from which the inbound shipments were discharged (Toreador, Turandot and Tal-

leyrand) and the vessels to carry out the outbound shipments delivered to Pier 5 (Turandot and Tatra) were owned by the following respondents:

Dampskibsaktieselskabet Den Norske Africa-Og Australielinie
Wilhelmsens Dampskibsaktieselskab
A/S Tonsberg
A/S Tankfart I
A/S Tankfart IV
A/S Tankfart V
A/S Tankfart VI

These are proper parties respondent. As to the other named respondents in this suit, the libel would be dismissed as to them in any event. There are averments in the libel (items 17 and 18 of Schedule B to the libel) respecting deliveries of cargo items to Pier 5 for shipment by Corneville. The owner of this vessel (as already noted) was S/A Sangstad, not a respondent, and therefore no relief could be given here as to these items in any event.

On substantially the same averments as in the first two suits, respondents by petition brought into the third suit—as impleaded respondents under Admiralty Rule 56 of the Supreme Court—Atlantic Stevedoring and Atlantic Piers; recovery over was asked on the same basis.

2. The duty of respondents to the cargo

It appears without dispute that the cargo items in suit were damaged to an extent not necessary now to determine while on Pier 5 in Brooklyn; the damage was caused by high water at Pier 5 on September 12, 1960 when Hurricane Donna struck the New York area.

It is not easy to determine under what law the duty of the carrier to the cargo is to be determined: the Carriage of Goods By Sea Act of 1936 (46 U.S.C. §§ 1300–1315; "Cogsa"), or the Harter Act of 1893 (46 U.S.C. §§ 190–196), or general maritime law.

Cogsa does not apply of its own force because it is applicable only "from the time when the goods are loaded on to the

time when they are discharged from the ship". 46 U.S.C. § 1301(e).

▇▇ The Harter Act is applicable while the goods are in the custody of the carrier before loading and also "between the discharge of cargo from the vessel and its proper delivery". Caterpillar Overseas S. A. v. S. S. Expeditor, 318 F.2d 720, 723 (2d Cir. 1963). And the same opinion points out that normally "proper delivery" means delivery to a fit and customary wharf (318 F.2d at 724). The discharge of the inbound cargo to Pier 5 was delivery to a fit and customary wharf. The goods last discharged were so discharged on Friday, September 9, 1960. At that time the wharf was fit and customary. The situation is different from that in Levatino Company, Inc. v. American President Lines, Ltd., 337 F.2d 729 (2d Cir. 1964), where chestnuts were discharged to an unheated pier *at a time* when it was so cold that chestnuts were likely to freeze.

▇▇ Absent valid contract stipulations, therefore it would appear that the duty to the inbound goods should be found in general maritime law and the duty to the outbound goods in the Harter Act.

In the suits at bar, however, there were relevant contract stipulations.

The bills of lading in respect of all the inbound shipments contained the following provisions:

"This bill of lading shall be governed by, have effect subject to and

be construed in accordance with the statutory and other laws of the United States of America, including the Carriage of Goods By Sea Act of the United States, approved April 16, 1936 and shall have effect subject to the Carriage of Goods By Sea Act * * *."

"The Carrier shall not be liable as carrier prior to the loading of the goods on board the vessel, or after the goods have left the vessels tackle on unloading. While the goods are in its actual custody before they are loaded on the vessel and after they are discharged therefrom either at the port of destination or transshipment or elsewhere, the liability of the Carrier shall be merely that of a bailee and during such periods the Carrier shall be entitled to all the exemptions from liability contained in Section 4 of the U. S. Carriage of Goods by Sea Act of 1936 as well as and in addition to all other exemptions and limitations set forth in this Bill of Lading."

"The provisions of the Carriage of Goods By Sea Act of the United States approved April 1936, shall, where applicable, apply to and govern the rights and obligations of the Carrier and the goods owner before the goods are loaded on and after they are discharged from the vessel and throughout the entire time the goods are in the custody of the Carrier."

■ These provisions are contradictory, confusing and ambiguous. They purport to incorporate Cogsa into the contract, which may validly be done so long as the result is not to diminish the liability of the carrier. 46 U.S.C. § 1303 (8); Gilmore and Black, The Law of Admiralty, page 125. At the same time they provide that in the relevant period the "Carrier shall not be liable as carrier"—wholly inconsistent with Cogsa— but "merely" as a "bailee" followed immediately by a statement that the carrier is entitled to the benefit of Section 4 of Cogsa. Finally Cogsa is expressly made

applicable "where applicable" to the "rights and obligations * * * before the goods are loaded on and after they are discharged from the vessel" etc.

■ Where the problem is one of construction of ambiguous language in a bill of lading, it seems better to adopt that construction which is most favorable to the cargo, this because the bill of lading is prepared by the carrier. Compania de Navigacion La Flecha v. Brauer, 168 U.S. 104, 118, 18 S.Ct. 12, 42 L.Ed. 398 (1897); The Caledonia, 157 U.S. 124, 137, 15 S.Ct. 537, 39 L.Ed. 644 (1895); Pannell v. S.S. American Flyer, 157 F. Supp. 422, 429 (S.D.N.Y.1957), modified on other grounds 263 F.2d 497 (2d Cir. 1959), cert. denied 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959). See The Monrosa v. Carbon Black, Inc., 359 U.S. 180, 183, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959).

■ I conclude, therefore, that as to the inbound goods discharged to the pier, Cogsa applies because made a part of the contract.

As to the outbound shipments, the relevant bills of lading contained the following provision:

"1 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier * * *."

■ These words seem entirely clear to incorporate Cogsa into the bills of lading. Cogsa thus applies to all the outbound goods on Pier 5 because Cogsa was made a part of the contracts.

By agreement of the parties, therefore, respondents as carriers owed a duty "properly and carefully" to "handle, stow, carry, keep, care for, and discharge" the cargo. 46 U.S.C. § 1303(2). In other words, respondents are liable for damage to the cargo caused by their negligence.

The result would be the same under general maritime law. Propeller Niagara v. Cordes, 21 How. 7, 62 U.S. 7, 23, 16 L.Ed. 41 (1859); Clark v. Barnwell, 12 How. 272, 53 U.S. 272, 280, 13 L.Ed. 985 (1851); Gilmore and Black, cited above, at 120.

And the effect of the Harter Act, if applicable, would simply be to leave in effect the general maritime law duty and to make "null and void" any provision "relieving from liability for negligence". 46 U.S.C. § 190.

Respondents point to the provision in Cogsa relieving the carrier from responsibility for damage resulting from "Act of God". 46 U.S.C. § 1304(2) (d).

But this does not take away the issue of negligence, because, as will be seen, the Act of God exception is not available to the carrier if the carrier was negligent in failing to guard against the natural event claimed to be the Act of God.

The carriers are responsible, of course, for any negligence of the impleaded respondents, Atlantic Stevedoring and Atlantic Piers, one or both of which had actual custody of the goods. A carrier is liable for any negligence of those in whose hands it has placed the goods. David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 298 (2d Cir. 1964).

Thus far, the parties appear to be in substantial agreement with the analysis here made.

3. The Act of God exception and the burden of persuasion on the issue of negligence

It must next be determined whether the burden of persuasion as to the issue of negligence rests on libelants or on respondents.

The matter is not without difficulty.

Respondents have pleaded, as an affirmative defense, in substance that Hurricane Donna was an "Act of God". These precise words are not used in the answers but there are general expressions ("* * * a cause or causes for which neither the Carriers nor the vessels are liable * * *") which are sufficient to raise the point, made more explicit in the brief for respondents (pp. 17–24).

The Act of God exception to liability of the carrier or bailee exists under general maritime law (Carver, Carriage of Goods By Sea (10th ed.) 10–13) and under Cogsa (46 U.S.C. § 1304(d).

The definition of "Act of God" in the present context seems generally to include, as an essential element, that the damage from the natural event could not have been prevented by the exercise of reasonable care by the carrier or bailee.

In The Majestic, 17 S.Ct. 597, 41 L.Ed. 1039, 166 U.S. 375 (1897) the Court referred with approval to the definition of Chancellor Kent, as follows (386, 17 S.Ct. 602):

"The act of God, said Chancellor Kent (2 Kent, Comm. p. 597), means 'inevitable accident, without the intervention of man and public enemies'; and again (volume 3, p. 216), that 'perils of the sea denote natural accidents peculiar to that element, which do not happen by the intervention of man, nor are to be prevented by human prudence.' A 'casus fortuitus' was defined in the civil law to be, 'Quod damno fatali contingit, cuivis diligentissimo possit contingere.' It is a 'loss happening in spite of all human effort and sagacity.' The words 'perils of the sea' may, indeed, have grown to have a broader signification than 'the act of God,' but that is unimportant here."

Judge McGohey appears to have assumed that an "act of God" is not only one which causes damage but one as to which reasonable precautions could not

have prevented damage. In Moran Transportation Corp. v. N. Y. Trap Rock Corp., 194 F.Supp. 599, 602 (S.D.N.Y. 1961) Judge McGohey said:

"Hurricane Hazel was not an Act of God. At Tomkins Cove it was neither so sudden nor so violent that Trap Rock's experienced men who had not less than twenty-four hours' warning could not have taken precautions to guard against it."

The definition quoted by Judge Inch with approval in The Empress of France, 49 F.2d 291 (E.D.N.Y.1930) is this:

"By 'act of God' is meant some inevitable accident which cannot be prevented by human care, skill, or foresight, but results from natural causes, such as lightning, tempests, floods, and inundations."

The exception for "perils of the sea" is very like in principle to that for an act of God. The former has been defined in The Giulia, 218 F. 744, 746 (2d Cir. 1914) as follows:

"Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

This definition has been cited with approval. R. T. Jones Lumber Co. v. Roen S.S. Co., 270 F.2d 456 (2d Cir. 1959). The significance for present purposes is in that part of the definition which makes an essential element of the exception that the perils "cannot be guarded against by the ordinary exertions of human skill and prudence".

Gilmore and Black, cited above, first deal with the "perils of the sea" exception which they define (at 140) as follows:

" * * * a fortuitous action of the elements at sea, of such force as to overcome the strength of the well-found ship or the usual precautions of good seamanship. Thus, in a sense, the absence of negligence as a concurring cause may be said to enter into the very definition of a sea peril, so that, in order to establish an exception under this clause, the ship would have to establish freedom from negligence."

They then turn to act of God and refer (at 141) to the language of an old English case, Nugent v. Smith, [1876] 1 C.P.D. 423, 444, defining act of God as follows:

" * * * a mere short way of expressing this proposition. A common carrier is not liable for any accident as to which he can show that it is due to natural causes directly and exclusively, without human intervention, and that it could not have been prevented by any amount of foresight and pains and care reasonably to be expected from him."

The authors then note (at 141–42): " * * * absence of human negligence or fault as a concurring cause is a part of the definition of the 'Act of God'".

The first definition of "Act of God" given in 1 Bouvier's Law Dictionary Rawle's Third Revision (8th Rawle ed.) p. 116 is:

"Any accident due to natural causes directly and exclusively without human intervention, such as could not have been prevented by any amount of foresight and pains, and care reasonably to have been expected."

And the following statement is from Carver, Carriage of Goods By Sea (10th ed.) 10:

"The meaning of 'act of God' in this relation has given rise to much discussion and difference of opinion. The result of this seems to be that to enable us to describe a casualty as arising from an act of God it must have two essential features. First, it must have occurred independently of human action; man must have been purely passive. Secondly, it must have been an event which the shipowner could not have avoided, or guarded against, by any means

which he could reasonably be expected to use."

█ It seems accepted on all sides that a shipper makes out a prima facie case against a carrier or bailee by showing merely that the goods were not turned out in as good condition as when delivered by or for the shipper. The carrier or bailee must then bring the loss within an "exception" to his liability established by law or contract. Gilmore and Black, cited above, at 162–163.

█ It would seem therefore to follow that the Act of God exception by definition cannot be established unless and until the carrier or bailee shows that the loss could not have been prevented by reasonable care and foresight. This logic would mean that in the case at bar the burden is on respondents to show the exercise by them of reasonable care or, to put it another way, that the damage could not have been prevented by the exercise of reasonable care.

The Majestic, above, is authority for this view. The Court approved the award of damages against a ship where luggage of passengers was wet by water and where the ship pleaded act of God. The Court said (166 U.S. at 386, 17 S.Ct. at 602):

" * * * the question still remains, on the doctrine of implied exceptions, whether the injury here was by the act of God, for which the company was not liable. The burden in this respect is on the carrier."

The burden meant that the carrier had to show that the damage could not have been prevented by reasonable care. The Court said (166 U.S. at 388, 17 S.Ct. at 603):

"In our opinion, the steamship company failed to show that the accident was one which could not have been prevented by human effort, sagacity, and care * * *."

Citing The Majestic as authority and referring to the common law rule, Carver, cited above, has this to say in discussing the act of God exception (at 12):

"What is needful is that the causes of the event shall have been so far beyond what could reasonably be foreseen, or, if they might have been foreseen, shall have been so far irresistible that no foresight or endeavor of man, reasonably to be expected, would have prevented their operation.

"It is not enough for the shipowner to show that the loss arose from natural, as distinguished from human, causes, and to leave it to the other side to show that there was some want of precaution or care on his part; he must himself show affirmatively that the causes were such that no reasonable amount of precaution and care would have enabled him to avoid or guard against them."

There is authority in England that the burden of proof as to negligence in respect of all the Cogsa exceptions (46 U.S. C. § 1304(2) (a) through (g)) is on the ship (Gosse Millard v. Canadian Government Merchant Marine, [1927] 2 K.B. 432, 436–437). The act of God exception was not specifically mentioned.

In discussing the effect of Cogsa on burden of proof, Carver, above, does not treat specifically the act of God exception but, criticizing the Gosse Millard decision, seems to say that the cargo should have the burden of proof as to negligence in connection with nearly all the Cogsa exceptions. Carver, cited above, at 185–186.

Gilmore and Black, cited above, seem to state clearly that under Cogsa the carrier has the burden of persuasion as to negligence in an act of God situation. They say (at 163; emphasis supplied):

"Once the damage is established, the carrier, it would seem has two main lines of possible escape. He may take up the burden of establishing that the loss falls within 4(2) (a) to (p) [which includes act of God as (d)]. If he does this suc-

cessfully, then either (as in 4(2) (a)) he is exonerated regardless of his negligence; or (as in 4(2) (c) [perils of the sea; analogous to act of God]) *he will, in effect, already have established his own freedom from negligence as a part of the process of bringing himself under the exception*; or, if the exception he has brought himself under is one to which his own contributing fault would disentitle him, the burden will shift to the shipper to prove the carrier's negligence or other fault."

There are, on the other hand, old decisions which indicate that when act of God is pleaded and the natural event shown, the burden is on the shipper to prove negligence in failing to take precautions. Examples are Clark v. Barnwell, 12 How. 272, 280, 53 U.S. 272, 13 L.Ed. 985 (1851); Taney, C. J., and Wayne, J., dissenting); M. & C. Railroad Co. v. Reeves, 77 U.S. 176, 10 Wall. 176, 190, 19 L.Ed. 909 (1869). Judge Friendly has in effect put the first of these cases to one side on its facts (Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 431; 2d Cir. 1962):

"The respondents in Clark v. Barnwell had not only established a peril of the sea as a cause but had negated all others; libelants in that case not merely failed to sustain a burden, but no evidence of negligence 'is found in the record,' 12 How. 283, 13 L.Ed. 985."

The authority of the two old Supreme Court cases has been virtually destroyed by later decisions.

Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934) is important in this connection. Onions were delivered on board ship in Spain in good condition but were turned out in New York "damaged by decay". The ship pleaded no liability because there was an exception relieving the ship of liability for decay and further because the damage was caused by "perils of the sea", a defense very like that of Act of God. The evidence indicated that damage to the onions was caused (a) by closing hatches in heavy weather (a peril of the sea) and (b) by keeping the hatches closed in fair weather (negligence). This Court concluded that since the ship had failed to prove (and could not prove) how much of the damage was due to the peril of the sea, the cargo could recover for the full damage. (D.C. 43 F.2d 247). The Court of Appeals reversed (2 Cir., 70 F.2d 261) because all the damage was from decay and thus prima facie shown to be within a specific exception for decay; therefore the cargo had the burden of proof to show that the exception was not conclusively established by showing that the decay in whole or in part was caused by negligence of the ship. Since the cargo could not show what part of the damage was due to negligence, the ship was left "excused" (70 F.2d at 263). The Supreme Court unanimously reversed, holding that the burden was upon the carrier to bring himself within an exception; that this was true with respect to exceptions implied in law such as "act of God or the public enemy" (293 U.S. at 304, 55 S.Ct. at 196); that it was also true in respect of exceptions agreed upon in the bill of lading; that the burden is placed on the carrier because he is a "bailee" who has "an extraordinary duty" and usually has peculiar knowledge of those facts relied upon to relieve him of the duty; and that the law "annexes a condition" to the exceptions "that they shall relieve the carrier from liability for loss from an excepted cause only if in the course of the voyage he has used due care to guard against it". (293 U.S. at 304, 55 S.Ct. at 196). The Court took note of such cases as Clark v. Barnwell, above, and Railroad Co. v. Reeves, above, and in this connection said (293 U.S. at 304–305, 55 S.Ct. at 196):

"It is commonly said that when the carrier succeeds in establishing that the injury is from an excepted cause, the burden is then on the shipper to show that that cause would not have produced the injury but for the car-

rier's negligence in failing to guard against it. Such we may assume the rule to be, at least to the extent of requiring the shipper to give evidence of negligence where the carrier has sustained the burden of showing that the immediate cause of the loss or injury is an excepted peril."

On its face, this language would not affect the analysis here made because, by definition, the carrier does not establish the "excepted cause" of act of God unless freedom from negligence in "failing to guard against it" is itself shown.

But, assuming the quoted language to refer to negligence with reference to an act of God exception, the Supreme Court appears to be limiting the old decisions to this effect: if a prima facie case of due care is made out by the ship, then the burden of *going forward* with evidence of negligence is on the shipper and (inferentially) the burden of *persuasion* is left on the ship. Cf. Alliance Assurance Co. v. United States, 252 F.2d 529, 535 (2d Cir. 1958).

A note appearing in the Texas Law Review discusses The Vallescura and other cases and says:

"* * * if the burden of the ship is to show that the *cause* of the injury was, for instance, a peril of the sea, it cannot be satisfied without a corresponding exclusion of any other cause, including that of negligence.

"If this is the case, under the causal type exception, can there really be a shifting burden? It would seem that if the ship actually carried the burden laid on her in Clark v. Barnwell, i. e., showed the damage to have been in actuality the result of an excepted cause, such showing would ipso facto, leave the shipper without a case.

"To cloud such an analysis, however, two further problems arise. One is the question of *separate* concurring causes, each of which was responsible for part of the damage. This will be discussed later. Another is the theory that although the loss be caused by a peril of the sea, the shipper may still recover by showing that the use of diligence on the part of the ship would have avoided the effects of the peril. It would seem however, that analytically, an attempt by the cargo to make such a showing would be in the nature of a rebuttal of the causation element of the ship's primary burden —if (under the bill of lading exception) that burden contains a causation element. The diverse effects of 'cause' and 'effect' type exceptions appear. As before stated, in the 'cause' type case, the question of proximate cause of the damage must be put in issue first by the ship, as part of its case for the excepted cause. Therefore, it would seem that an attempt by the shipper to show the efficiency of another cause (negligence) must be in the nature of a rebuttal and of meeting the requirement that he 'go forward' with some showing of negligence, in order to prevent an instructed verdict." Note, Cargo Damage at Sea: The Ship's Liability, 27 Tex.L.Rev. 525, 533 (1949).

The length of this discussion may well have been unnecessary in view of very plain language in a recent Supreme Court decision, Mo. Pac. R. R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L. Ed.2d 194, rehearing denied 377 U.S. 984, 84 S.Ct. 1880, 12 L.Ed.2d 752 (1964), quoting and citing The Vallescura. The Supreme Court said (377 U.S. at 138, 84 S.Ct. at 1145):

"Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it

was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability."

The case dealt with a railway carrier but, unless the provisions of Cogsa can be said to be to the contrary (which seems not possible), the language seems applicable to maritime cargo claims.

For the reasons indicated, the conclusion is that respondents have the burden of persuasion that damage from Hurricane Donna could not have been guarded against by reasonable care on their part.

4. Hurricane Donna and its effect

A hurricane is a tropical cyclone with winds of more than 75 miles per hour ("mph") which move counterclockwise in a circular fashion around a center area, or "eye", where there is little wind or dead calm. If a tropical cyclone has winds of less than 75 mph it is usually called a "tropical storm". A hurricane is normally accompanied by heavy rain.

The effect of a storm or hurricane over water is to raise the level of the water above the level of the normal, astronomical, predicted tide. The difference between the observed water level and the astronomical tide level is "storm surge" or "hurricane surge".

The United States Weather Bureau has local offices over the country, including one in New York City; it also has in Miami a National Hurricane Center, which is a specialized research and warning service.

During the course of a hurricane, National Hurricane Center through Miami Weather Bureau issues every six hours a numbered "advisory" or report of information. These are issued at 5 and at 11, before noon and after noon. Bulletins are issued in between; for an emergency or if there is a radical change a special advisory is issued at any time.

Based on each advisory, the Center forecasts where the hurricane will be 24 hours later; these forecast positions are used within the Bureau and possibly by the Air Force and Navy but apparently they are not included in the advisory.

Local offices of the Weather Bureau receive the hurricane advisories and issue such local bulletins as seem indicated by local conditions.

Hurricane Donna was first observed on September 2, 1960 several hundred miles east of Puerto Rico moving westward from the direction of the Cape Verde Islands. In the first advisory (from San Juan) Donna was described as a "severe hurricane". It then moved west northwest then west, passing north of Puerto Rico and Cuba.

During September 9 (Friday) Donna moved at 10–12 mph north of Cuba toward the Florida keys. At 5 p. m. Eastern Standard Time ("EST") it was about a hundred miles southeast of Key West, had slowed somewhat and was moving at 9 mph toward the west northwest. The 5 p. m. advisory stated that "no material change is expected in intensity speed or direction during the next 12 hours".

At 11 p. m. EST on September 9, the center of Donna was 35 miles off the Florida keys moving northwest at 7 mph. The 11 p. m. advisory stated: "Little change in intensity and speed is indicated during the next 12 hours and the direction of movement will likely change to slightly more northerly".

According to a report by the Army Engineers: "All indications pointed to the storm entering and continuing into the Gulf of Mexico".

During September 9, the location of Donna at the hours indicated on September 10 were forecast by the Weather Bureau to be as follows:

5 a. m. — slightly west of Key West

11 a. m. — in Gulf of Mexico about 90 miles west of Fort Myers

5 p. m. — in Gulf of Mexico about 60 to 70 miles west of Tampa

11 p. m. — about on the Florida west coast

These forecast locations were farther to the west than the actual track of Donna on September 10. The chief forecaster of the National Hurricane Center testified that this was because "recurvature was sharper than anticipated".

Recurvature is a change in the direction of a hurricane from a west or northwest movement to a north or northeast movement. It is a consequence of a meeting of the west or northwest moving hurricane with southerly winds or the mid latitude westerlies (winds which carry the jet stream). The effect is to turn the westerly slow moving hurricane to the north and northeast. Generally a hurricane moving from the direction of the Cape Verde Islands is pushed west by the trade winds south of a line of high pressure area extending west from the Azores and called the "Bermuda High". At the western end of the Bermuda High, the hurricanes often meet the southerly winds or mid latitude west winds and are turned, or recurved, toward the north or northeast. The length of the Bermuda High varies. When it is long and extends through Bermuda over a part of the United States, the hurricane will go west into the Gulf of Mexico and any recurvature will naturally occur out in the Gulf of Mexico and at a more westerly longitude than when the Bermuda High is shorter and does not extend to or over any part of the United States; in the latter case any recurvature will normally occur off the east coast of the United States.

The Bermuda High recedes from the west and shortens progressively from August through the late fall months, tending to bring it about that any recurvature of a hurricane in September would be at a more easterly longitude than in August. Recurvature in September while not invariable is more frequent than not.

When recurvature occurs, the forward speed of the hurricane increases; moving west before the trade winds the speed averages 12 mph; after recurvature the speed may be two, three or five times that rate.

It is most difficult to forecast the point of recurvature, and apparently also the extent, that is, how sharp will be the curve around to the northeast; forecast of the path is most difficult during the period of recurvature; and it is more difficult to forecast speed and direction after recurvature than before.

As already noted, the actual track of Donna on September 10 was not as far west as had been forecast; at 11 p. m. EST on September 10 (Saturday), instead of being on the Florida west coast (as predicted) Donna was near Lakeland, some 50 miles to the east, moving at about 12 mph.

On Sunday, September 11, Donna continued to move in a northeasterly direction and with increasing speed as shown by its speed at the following hours (EST) on September 11:

| | |
|---|---|
| 5 a. m. | 14 |
| 11 a. m. | 19 |
| 5 p. m. | 23 |
| 9 p. m. | 35 |
| 11 p. m. | 40 |

Beginning at 5 a. m. on September 11, the Weather Bureau forecast positions for Donna for the following day were shifted well to the east of the forecast track up to that time. As it turned out, the forecast positions were to the east of the actual track of Donna on September 12 by some 180 or 200 nautical miles (about 206 to 228 statute miles). If Donna had taken the course forecast by the Weather Bureau as her course from 5 a. m. September 12 through 11 p. m. September 12, she would have passed at least 200 statute miles east of the eastern tip of Long Island and there would have been no pier flooding in New York Harbor.

The first hurricane warning issued by the Weather Bureau for an area including New York City was at 9 p. m. EST on Sunday, September 11. This was a special advisory (numbered 38) headed: "hurricane emergency warnings 9 p m".

New York at that period of the year was on a time one hour faster than at other periods. New York Construction Law § 52. In New York (and doubtless elsewhere) the faster time is usually called Daylight Saving Time ("DST") and the slower time Eastern Standard Time ("EST").

The first hurricane warning from the Weather Bureau to New York about Donna was thus issued at 10 p. m. DST on Sunday, September 11, by the Miami Weather Bureau; this was repeated to news media in New York by the Weather Bureau office here. This warning stated among other things that on Monday morning, September 12, the center of Donna would be "a short distance off the East end of Long Island". At 11:55 p. m. local time Sunday, September 11, the New York Weather Bureau office issued a local bulletin, warning, among other things, that tides may run from five to eight feet above normal on Monday morning.

Donna did hit New York Harbor on Monday, September 12. As it approached here, the eye elongated to an east-west distance of about 100 miles. There were high winds and heavy rains from at least 8 a. m. DST that morning. The eye passed over Long Island between 2:30 p. m. and 3:30 p. m. DST. The western edge of the eye brushed the New Jersey shore, the eastern edge was about 100 miles east on Long Island, and the middle of the eye was thus in the western part of Suffolk County.

During the passage of Donna and at 3:18 p. m. DST on September 12, the water level in New York Harbor rose to the highest level in history, despite the fact that the storm surge of Donna was not the highest. One of the chief reasons for this was that the passage of Donna coincided with the peak of the predicted astronomical tide. Wave action at times brought the water level higher than the statistically recorded levels; from pictures taken during the hurricane, wave heights in New York Harbor were estimated by Army Engineers at about 5 feet.

The comparison between the water levels of Donna and the four highest levels during previous hurricanes or storms, for two points in New York Harbor, are as follows:

Heights in Feet Above Mean Low Water

| | The Battery | Fort Hamilton |
|---|---|---|
| Donna | 10.7 | 10.9 |
| February 19, 1960 | 8.4 | 9.2 |
| November 7, 1953 | 9.7 | 10.0 |
| November 25, 1950 | 9.2 | 9.8 |
| September 14, 1944 | 8.3 | 9.0 |

The foregoing figures are taken from the report of the Army Engineers (Ex. AE) for Donna and for November 7, 1953, with an adjustment of 2 feet 3 inches to translate feet above mean sea level to feet above mean low water. The other figures are taken from Exhibits 9 and 10.

During the passage of Donna, the water level in New York Harbor rose rapidly and fell even more rapidly.

### 5. Pier 5 and Donna

Pier 5 in Brooklyn, where the goods in suit were located when water damaged, is in a row of piers extending into Bay Ridge Channel out from the Bush Terminal Warehouses in Brooklyn. Pier 5 is about midway between The Battery and Fort Hamilton.

Pier 5 is 1310 feet long and 150 feet wide. The floor of the pier is 10 feet above mean low water. The City of New York requirement for piers in this respect is that they be 9 feet above mean low water. The total floor area for cargo of Pier 5, including track area, is 183,500 square feet. The pier is covered. An asphalt roadway, 50 to 60 feet wide, runs down the center. Cargo is stored on either side of the roadway and partially

in the roadway, about 7 or 8 feet on each side. Some sections of the pier are kept clear so as to enable loading and unloading to be done to and from the hatches in ships alongside. There was an isolated section at the water end for gear and pallets, there was office space midway the length of the pier and also at the end, and there was an area for keeping the small fork lift trucks used to handle cargo ("hi-los"). The pier would support cargo weight of about 4000 tons. Four ships could tie up alongside the pier at any one time.

As noted earlier, Atlantic Stevedoring was the operator of Pier 5 under a contract with respondents.

The Toreador arrived at the pier, directly from the Panama Canal, on September 7 to discharge only, completed discharge of cargo about 6 or 7 p. m. on Friday, September 9, and sailed the same evening for Boston. The weather on her trip to Boston was good.

The Turandot had arrived at the pier about September 8 to load only and her loading began that day or on Friday, September 9. The Tatra arrived at the pier to load only on Saturday, September 10, or Sunday, September 11; her loading was to commence on Monday, September 12.

At the close of business on Friday, September 9, about 80% of the space on Pier 5 was occupied by cargo; this cargo was about 2500 tons in weight. Of the cargo there, about 75% was stacked in tiers about 10 to 12 feet high resting on pallets. A pallet is a wooden platform or tray about six inches high designed for use in handling cargo with a fork lift truck ("hi-lo"). The purpose of the pallet is not to raise cargo from the pier floor but to enable the fork lift truck to handle the cargo by lifting the supporting pallet. The cargo not on pallets was of a nature not usually stacked in tiers, such as long rugs, graphite and the like.

The labor on the pier had to be obtained from or through the Waterfront Commission, established by compact between the States of New York and New Jersey. According to Commission rules, this labor must be ordered by 3 o'clock of each afternoon for the next morning and for a Monday morning by 3 o'clock in the afternoon of the preceding Friday.

Pier 5 is not normally operated on Saturdays or Sundays and at closing time on Friday, September 9, there were no plans to operate Pier 5, and it was not operated, on the following Saturday and Sunday.

On Monday morning, September 12, the labor ordered for that day showed up at 8 a. m. DST. There were 7 "gangs" of 23 men (including supervisor and 2 machine operators) and 70 "extra labor" or a total of 231 men. When they reported there were already high winds and heavy rain. The two ships refused to open hatches because of the rain. Some labor was receiving and delivering cargo. All other labor was put to work either placing extra pallets under the cargo tiers (to raise them higher) or nailing up doors which began to blow in during the morning. Through these efforts, extra pallets were placed under about 3% to 5% of the cargo on the pier.

Lunch hour for labor was from noon to 1 p. m. DST. About 1:20 p. m. DST, the water level reached the floor of the pier and all trucks were ordered off. From then until about 3:30 p. m. DST the pier was flooded. After 3:18 p. m. DST the water rapidly receded and as soon as it had left the floor, the work of reconstruction began.

Since the floor of the pier is 10 feet above mean low water, cargo on the floor of the pier would have been statistically in about 8 to 9 inches of water and cargo on one pallet would have been statistically in about 2 to 3 inches of water. But having in mind wave action the cargo must have been in water to a greater depth—a depth up to as much as 36 inches. The damage for which these suits are brought came from this wetting.

6. The exclusion of business records

Libelants attempted to show through cargo damage surveyors that Pier 5 had been flooded a number of times

before Donna. Those witnesses were permitted to testify to their observations of water damage to cargo on Pier 5 following earlier storms, but their reports (Exhibits 5 and 6 for identification) containing what they were told as to when the cargo arrived on Pier 5 and as to when and why it was water damaged were excluded (SM 86–97, 108–109). The reason for the exclusion was that while the reports may have been business records the particular information was not within the knowledge of the entrant nor did it appear that the information came from others under a duty to know the facts. Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930); McCormick on Evidence, 602–3.

The testimony of the surveyors does show, however, that during storms (or hurricanes) of November 25, 1950 and November 7, 1953 there was water above the floor of Pier 5. This would not appear from the statistics because the highest water level at Fort Hamilton during the 1950 storm was 9.2 feet above mean low water and during the 1953 storm it was 9.6 feet above mean low water; the floor of Pier 5 is 10 feet above mean low water. But wave action brings the water level at times above the recorded figures, as already noted.

The excluded reports therefore would have been merely cumulative in view of the findings made.

7. Reasonable care did not require that water damage from Hurricane Donna be foreseen and guarded against

The evidence establishes that the water damage from Hurricane Donna could not have been "guarded against by the ordinary exertions of human skill and prudence". The Guilia, cited above.

The principal evidence is that at the close of the business day on Friday, September 9, no one could reasonably have been expected to prepare for Donna hitting New York on Monday, September 12. Therefore respondents were not negligent when on Friday, September 9, at about 6 p. m. DST they left the cargo on Pier 5 in its then condition, that is, mostly on one pallet, 6 inches from the pier floor.

At that time, as already noted, Donna was about a hundred miles southeast of Key West and moving toward the west northwest at about 9 miles per hour. The official Weather Bureau advisory issued at that hour stated: "Subject to temporary and rather minor variations no material change is expected in intensity speed or direction during the next 12 hours".

The New York Times reported official forecasts for the New York City area from the United States Weather Bureau on September 9, 10 and 11 as follows (judicial notice being taken thereof):

from the issue of September 9 (page 58, column 2):

"Fair, warm today and tonight; highest temperature in the high 80's; highest temperature humidity index in the high 70's; mostly southwesterly winds between 10 and 15 miles an hour; lowest temperature in the high 60's. Mostly fair, continued warm tomorrow."

from the issue of September 10 (page 42, column 6):

"Showers this morning followed by some cloudiness today; highest temperature near 80; highest temperature humidity index in the 70's; southerly winds becoming west to northwesterly between 10 and 15 miles an hour. Mostly fair tonight, lowest temperature in the 60's. Mostly fair, not as warm tomorrow."

from the issue of September 11 (page 95, column 1):

"Considerable cloudiness today; chance of showers by late evening; highest temperature in the 70's; highest temperature humidity index in low 70's; north to northeasterly winds 10 miles an hour; cloudy with periods of rain

tonight and tomorrow; lowest temperature in the 60's."

In addition, The New York Times carried a news story in the issue of Saturday, September 10 (page 1, column 3) containing these statements:

"In New York, the Weather Bureau said the hurricane would not produce effects on the weather here for two or three days, if then. Friday night's rains were said not to be associated with the hurricane".

From 7 a. m. EST on September 8 to 11 a. m. EST on September 11, Donna was passing through an area from which no hurricane had ever come to cause significant damage in New York Harbor. Until 10 p. m. DST on Sunday, September 11, there was no warning from the Weather Bureau that Donna might reach New York Harbor. The head of the National Hurricane Center testified that on Friday, September 9, he had no concern that in sixty hours Hurricane Donna would be in New York. The head of the Weather Bureau office in New York testified (SM 283) that on Friday, September 9,

"the hurricane was still moving in a west-northwest direction towards the southern tip of Florida and very slowly, and since the advisories indicated, and all the forecast information available indicated that it would continue on about the same track, we figured then that it would move very close to the southern tip of Florida, at least, and for that reason we did not become very excited about it affecting the New York City area especially over the weekend."

If this was the belief of the weather experts themselves, how possibly could the management of Pier 5 be found unreasonable in acting at the same time on the same belief?

This thought is clearly expressed in Merchants Ice & Cold Storage Co. v. United Produce Co., 279 Ky. 519, 131 S.W.2d 469, 471 (1939), also a flood damage case:

"We find the rule in this character of case to be that a warehouseman is not responsible for loss resulting from an act of God, but that such a plea will not benefit him where he is warned of the approaching calamity and fails to use ordinary care to protect the goods or to remove them to a place of safety.

" * * * The United States Weather Bureau bulletin of January 20th was published in the morning newspapers on January 21st, and stated that a crest of 38 to 39 feet was expected the following Saturday with a probability of 42 feet 'early next week' if the rainfall should be as heavy as it was Sunday and Monday. The expert advice of the United States Weather Bureau was that the river would not reach a stage of 39 feet until Saturday, and this would lack reaching defendant's basement by 4 or 5 feet; if it reached a stage of 42 feet 'early next week' by reason of the heavy rains continuing, still the river would lack reaching the defendant's basement by 1 or 2 feet. Instead of defendant having warning and notice of the unprecedented rise of 6.3 feet from January 21st to January 22d, in a river that was then at the extreme high stage of 39.1 feet, it had what is generally regarded as expert information given out by the United States Weather Bureau that there would be no rise above 39 feet, and that figure was three days off, and under the most unfavorable conditions the rise would not exceed 42 feet 'early next week.' After the meteorologist, who had twenty-seven years' experience with the United States Weather Bureau, on January 20th predicted in effect that the defendant's warehouse would be safe by 5 feet until Saturday, there could have been no negligence on the part of defendant in following this prediction and assuming that the goods in its basement would be safe until the early part of the following week."

The case for libelants is that hurricanes are erratic phenomena of nature; no two are alike or follow the same track; they cross, recross and recurve without seeming to obey any physical law; it is difficult to predict the course of a hurricane; the first part of September is the climax of the hurricane season. All these things are true.

■ Libelants then conclude that reasonable care required the pier operators to protect the cargo against the *possibility* of Donna hitting New York. This conclusion cannot be accepted. The conclusion would require protective efforts whenever *any* tropical storm or hurricane developed in the Atlantic west of the Cape Verde Islands, or in the Caribbean Sea, or in the Gulf of Mexico. Any such disturbance *could* take a course which would affect New York; prediction is almost impossible; therefore, say libelants, protective efforts are required.

This not only seems an unreasonable standard; its application would result in economic waste. In all but a few cases, the extensive and expensive labor involved would be unnecessary. Since 1938, only five hurricanes have seriously affected New York or an average of not more than one every five years.

Under these circumstances it seems entirely reasonable and prudent to rely on Weather Bureau warnings and to take action when such warnings have been given and not before.

In discussing negligence, the following comment appears in Restatement of the Law of Torts, § 302, page 818:

"*Abnormal conditions of nature.* The actor is not required to anticipate or provide against conditions of nature or the operation of natural forces which are of so unusual a character that the burden of providing for them would be out of all proportion to the chance of their existence or operation and the risk of harm to others involved in their possible existence or operation. It is therefore not necessary that a particular operation of the natural force be unprecedented. The likelihood of

its recurrence may be so slight that in the aggregate the burden of constantly providing against it would be out of all proportion great as compared with magnitude of the risk involved in the possibility of its recurrence."

Moreover, not even the efforts which libelants suggest were required could have protected the cargo. Libelants say that the cargo from Toreador (which sailed Friday evening, September 9) should have been discharged to three pallets instead of to one. This would have raised such cargo 18 inches above the pier floor. But the evidence is that water came up on September 12 to a height of 22 to 36 inches above the floor.

It is assumed that there had been occasions before Donna when water rose above the floor of Pier 5 but this does not affect my view as to what might reasonably be required of the pier operators in the period September 9–12, 1960. Unless they might reasonably have been expected to predict the passage of Donna through an area affecting New York Harbor, they could not reasonably be expected to guard against it.

■ It is true that from 10 p. m. DST on Sunday, September 11, the pier operators knew or should have known that Donna was heading in such a direction and at such a speed as might produce high tides in New York Harbor on Monday morning, September 12. It is also true that nothing was done about the cargo on Pier 5 until 8 a. m. DST on Monday. As libelants recognize, however, nothing could have been done about the cargo at 10 p. m. DST on Sunday night. Labor must be obtained from or through the Waterfront Commission and the Commission was not open on that Sunday night. Labor for pier 5 for 8 a. m. DST Monday had been ordered at 3 p. m. DST on Friday, all in accord with Commission rules. The theory for libelants is that on Friday afternoon it was negligence for the operators of Pier 5 not to anticipate the coming of Donna on Monday morning and protect against it by working on Saturday and Sunday. This

theory cannot be accepted in the face of the evidence of the location, speed and direction of Donna during all of Friday. If this evidence gave the Weather Bureau experts no cause at that time to believe that Donna would affect New York Harbor, it was reasonable for the Pier 5 operators to act on the same basis.

The evidence shows that respondents have not only carried the burden of proof, but have established, that reasonable care would not have foreseen and prevented the water damage from Donna.

8. The World Products decision

Libelants naturally place much reliance on World Products, Inc. v. Central Freight Service, Inc., 222 F.Supp. 849 (D.N.J.1963), affirmed 342 F.2d 290 (3d Cir., February 15, 1965). A warehouseman in Edgewater, New Jersey, was held liable in a diversity case for water damage to goods in its warehouse during Hurricane Donna. The warehouse extended over the Hudson River.

There appear to be distinctions in fact between that case and the case at bar. For example, the Edgewater warehouse was only 3 to 4 feet above "normal high tide" (222 F.Supp. at 852). If "normal high tide" is the same as "mean high water" then the warehouse was 7.6 to 8.6 feet above mean low water, whereas Pier 5 was 10 feet above mean low water (mean high water correction to mean sea level is assumed to be 2.3, the same as the mean low water correction, see SM 257, but see SM 311).

The Court also found that "on a number of occasions prior to 'Donna', the waters of the Hudson must have risen to or above the level of the warehouse floor;" (222 F.Supp. at 852).

If there are no valid distinctions in fact between the two cases, then I must respectfully disagree with the result reached in the World Products case.

The foregoing includes the findings of fact and conclusions of law required by Rule 46½ of the Supreme Court Admiralty Rules.

The decrees must be for respondents, dismissing the libels on the merits.

Submit decrees on notice.